**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

TIMOTHY McMAHON,                          )
                                         )
      Plaintiff,                       )
                                         )
vs.                                       )    Case No. CIV-08-811-D
                                         )
STATE OF OKLAHOMA, ex rel. THE           )
  BOARD OF REGENTS OF OKLAHOMA            )
  AGRICULTURAL AND MECHANICAL             )
  COLLEGES, a constitutional state agency, )
                                         )
      Defendant.                       )

## <u>ORDER</u>

Before the Court is the Defendant's Motion for Summary Judgment [Doc. No. 34]. Plaintiff timely responded, and Defendant filed a reply.

<u>I. Background:</u>

Plaintiff, a Caucasian male employed as an Associate Professor of Physics at Langston University ("Langston"), alleges that Defendant has discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* ("Title VII") in connection with his employment.[1] Specifically, Plaintiff contends that Defendant discriminated against him on the basis of his race by denying him tenure; Plaintiff also alleges that, after he filed a Charge of Discrimination pursuant to Title VII, Defendant retaliated against him by failing to award him a salary increase, failing to promote him to the position of full professor, and denying a request for leave.

---

[1]Initially, Plaintiff also asserted a pendent state law claim; however, he has expressly withdrawn that claim. Plaintiff's Response at p. 25.

Defendant argues the undisputed facts establish that Plaintiff cannot satisfy his *prima facie* burden with respect to discrimination or retaliation. It denies that any act or omission regarding Plaintiff's employment was motivated by discrimination or retaliation and contends it had justifiable business reasons for all employment decisions regarding Plaintiff. Even if Plaintiff could satisfy his *prima facie* burden, Defendant argues he cannot show that its proffered justifiable reasons were a pretext for discrimination.

II. Summary judgment standards:

Summary judgment is proper where the undisputed material facts establish that a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)*; Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one which may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). To dispute a material fact, a plaintiff must offer more than a "mere scintilla" of evidence; the evidence must be such that "a reasonable jury could return a verdict" for him. *Id.* The facts and reasonable inferences therefrom must be viewed in the light most favorable to Plaintiff. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005).

If the undisputed facts establish that Plaintiff cannot prove an essential element of a cause of action, Defendant is entitled to judgment on that cause of action. *Celotex*, 477 U.S. at 322. However, Defendant need not disprove Plaintiff's claim; it must only point to "a lack of evidence" on an essential element of that claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The burden then shifts to Plaintiff to go beyond the pleadings and present facts, admissible in evidence, from which a rational trier of fact could find for him; conclusory arguments are insufficient, as the facts must be supported by affidavits, deposition transcripts, or specific exhibits

incorporated therein.[2]  *Id.*, at 671-72.  It is not the Court's responsibility to attempt to find evidence which could support Plaintiff's position.  *Adler*, 144 F. 3d at 672.

## III.  Undisputed facts:

In this case, the parties agree that Plaintiff, who holds a doctorate in Physics from Purdue University,  was hired by Langston as an Assistant Professor in 1993.  It is not disputed that, in 1998, he was promoted to Associate Professor.  At the time Plaintiff was hired, Langston's policies and procedures regarding faculty tenure, promotions and related matters were governed by a 1981 Faculty and Staff Handbook ("1981 Handbook"); a copy of the 1981 Handbook is submitted by Defendant as Exhibit 1 to the affidavit of Dr. Clyde Montgomery, Jr., Langston's Vice President of Academic Affairs,  submitted as Defendant's Exhibit A ("Ex. A-1").  Although the  1981 Handbook tenure provisions were changed in 2009, Defendant does not dispute that the 1981 provisions applied to Plaintiff at the time relevant to his claims.

Pursuant to the 1981 Handbook,  faculty are eligible for tenure primarily on the basis of longevity of employment, apparently without regard to merit or other factors.  The 1981 Faculty Handbook provides that, immediately upon initial employment, faculty members have "probationary status for not less than three (3) or more than six (6) years."  1981  Handbook ¶ G (1).  The 1981

---

[2]Plaintiff argues at page 11 of his response that the Court must "disregard all evidence favorable to the moving party" when assessing a summary judgment motion.  That statement is contrary to the established summary judgment standard, which requires Plaintiff to present admissible evidence to show that a fact is disputed; to overcome summary judgment, he must present evidence sufficient to allow a reasonable jury to find in his favor.  Contrary to his argument, *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000) does not relieve Plaintiff of this burden. While it is correct that inferences based on admissible evidence are to be construed in Plaintiff's favor, that does not require rejection of Defendant's evidence.  Nor is the Court permitted to accept Plaintiff's personal beliefs or conclusory statements as "facts" to be inferred in his favor; only facts supported by evidence may be considered.  *Anderson*, 477 U.S. at 247-48; *Adler*, 144 F. 3d at 671-72.

Handbook then explains that, following the probationary period, faculty members can attain tenure as follows:

> Faculty members holding academic rank above the level of instructor may receive tenure at any time after a three (3) year probationary period. If such person is reappointed after said period and promoted in rank, he/she thereby acquires tenure.

*Id.* ¶ G (2). The 1981 Faculty Handbook then adds the following:

> Faculty members who are reappointed for seven (7) years consecutively with or without promotion thereby acquire tenure.

*Id.* ¶ G (3).

Defendant does not dispute that this policy was not followed with respect to Plaintiff and 15 other faculty members. In fact, during the June 19, 2009 meeting of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges ("Board of Regents"), Langston University's President, Dr. JoAnn Haysbert, told the Board of Regents that she became aware of the 1981 tenure policy while she and others were developing a new faculty handbook. Minutes, June 19, 2009 Board of Regents meeting, Defendant's Ex. A-3. Dr. Haysbert further explained that, of the faculty members being submitted for tenure approval at the June 19, 2009 Board of Regents meeting, 16 were recommended because of the 1981 Faculty Handbook provisions; she said those 16 individuals should have previously been recommended pursuant to the 1981 policy. *Id.* Dr. Haysbert explained that "it was discovered that the University did not adhere to the policy, and that is the reason so many have been brought forward" for tenure approval. Dr. Haysbert explained that, with regard to the 16 faculty members:

> These are individuals who should have received tenure some time ago by virtue of the former policy. Langston reconciled those who should have been tenured under the old policy along with those who qualified under the current policy, and now the University is current in its recommendations.

Minutes, Defendant's Ex. A-3, p. 3 of 12. Board of Regents Chairman Dr. Marvin Burns added that, "in effect these individuals would have automatically been granted tenure pursuant to the former policy; however, it was never recognized." *Id.*

It is not disputed that Plaintiff was among the 16 faculty members who were affected by Langston's failure to adhere to the 1981 Faculty Handbook tenure policy and that these 16 faculty members, including Plaintiff, were all approved for tenure by the Board of Regents on June 19, 2009. It is also undisputed that the 16 faculty members whose tenure was delayed included individuals of all races; six were identified as Black, one is identified as African, four are Asian, and five, including Plaintiff, are White. *See* Faculty Tenure and Promotion Recommendations, 2009, Defendant's Ex. 2 to Montgomery affidavit, Ex. A. The record further reflects that, of the 16 professors belatedly granted tenure at the June 19, 2009 Board of Regents' meeting, two were hired the same year as Plaintiff. These professors are Dr. John Coleman, an African American who was hired as an Associate Professor in 1993 and is now Chairman of the Chemistry Department, and Dr. Joel Snow, a Caucasian Associate Professor also hired in 1993. Another of the 16 professors belatedly granted tenure, Dr. Edward Khiwa, was hired prior to Plaintiff, having joined the faculty in 1988 as an Associate Professor. Dr. Khiwa is African. Montgomery affidavit, ¶¶ 4-6.

In the summer of 2008, Plaintiff applied for promotion to the rank of professor. It is not disputed that, on July 16, 2009, Dr. Montgomery notified Plaintiff his request was denied; he also suggested Plaintiff meet with him to discuss future plans for promotion. *See* July 16, 2009 letter to Plaintiff from Dr. Montgomery, Defendant's Ex. A-5. It is also not disputed that no faculty members were promoted to the rank of professor for the 2009-10 academic year. Montgomery affidavit, ¶ 9; June 19, 2009 Board of Regents minutes, Ex. 3 to Montgomery affidavit, p. 49-50.

The undisputed evidence establishes that a grant of tenure to a Langston faculty member does not automatically result in a salary increase. Montgomery affidavit, ¶ 10. Plaintiff admits there is no policy or procedure which provides that a salary increase is warranted solely because tenure is granted. Plaintiff's dep., Defendant's Ex. E, p. 78, lines 6-13.

The evidence reflects that, for the 2010-11 academic year, Plaintiff will receive an increase in salary; however, he did not receive a merit increase for the 2007-08 or 2009-10 academic years. The undisputed evidence establishes that, in October 2007, Langston submitted for Board of Regents approval a salary increase proposal to be implemented over several years; the plan called for "staged merit increases" over a five-year period, with the timing of the increase to be based on an employee's years of service as of October 2007. Affidavit of Langton Assistant Vice President for Fiscal Affairs Debra G. Masters, Defendant's Ex. D ("Masters affidavit"). According to the plan, which was approved by the Board of Regents, employees with 20 or more years of service as of October 2007 were eligible for salary increases in fiscal year 2008, which began in October 2007; employees with 15 to 19 years of experience as of October 2007 were eligible for merit increases in fiscal year 2009, and employees with 10 to14 years of experience as of October 2007 were eligible for fiscal year 2010 increases. Masters affidavit, ¶ 2. The purpose of awarding increases over a five-year period was to ensure Langston would have sufficient funds to pay the higher salaries. *Id.* After the Board of Regents approved the foregoing plan, a memorandum explaining these provisions was sent to Langston employees by the Vice President for Fiscal and Administrative Affairs, Angel Kelso-Watson. Masters affidavit, ¶ 2; Memorandum, Ex. 1 to Masters affidavit.

When the salary increase plan was implemented in October 2007, Plaintiff had been employed since 1993, or a period of 14 years; as a result, he was not eligible for the initial increases effective in fiscal year 2008 or 2009. He was eligible for the raises to be given at the beginning of fiscal year 2010; it is not disputed that he received a salary increase at that time.

The record reflects that one African American professor, Dr. Doris J. Jones, received a 2009 merit increase although she was not yet eligible under the new plan. However, the record shows that this resulted from a mistake in calculating her years of service, and was adjusted after the error was discovered. Montgomery affidavit, Defendant's Ex. A, ¶ 13.

It is not disputed that Plaintiff inquired about his tenure status as early as 1999; he submits correspondence to Dr. Jean Bell Manning, who was Vice President of Academic Affairs at the time. Plaintiff's Exs. 6, 7. He believed that, as of 1999, he should have automatically been granted tenure. In November of 2007, he met with Dr. Montgomery because he had not received formal notification regarding his tenure; Dr. Montgomery told him he would receive a letter regarding his status. Plaintiff's Ex. 7. On April 23, 2008, Dr. Montgomery sent Plaintiff a memorandum stating that Langston had not promised him tenure, that he was in a tenure track position, and that he was welcome to apply for tenure. Plaintiff's Ex. 8. Dr. Haysbert then wrote to Plaintiff and confirmed that he was not currently tenured, but invited him to apply for tenure. Plaintiff's Ex. 9.

Dr. Montgomery testified that, when Plaintiff met with him regarding his tenure status, he provided Dr. Montgomery with the 1981 Faculty Handbook language indicating tenure was automatic after a certain time period. Montgomery dep., Plaintiff's Ex. 2, p. 19. Dr. Montgomery testified that, following this meeting, a study was conducted to determine if other professors were impacted by the 1981 Faculty Handbook tenure policy. *Id.* As a result of that study, it was

determined that Plaintiff and other professors should have received tenure; ultimately, this led to the recommendation to the Board of Regents and resulted in the June 2009 grant of tenure to Plaintiff and 15 other faculty members. Montgomery dep., p. 30, lines 24-25; p. 31, lines 1-3.

On or about June 5, 2008, Plaintiff filed a Charge of Discrimination with Equal Employment Opportunity Commission ("EEOC") by submitting the charge to the Oklahoma Human Rights Commission. A copy of that charge (the "2008 Charge") is submitted as Defendant's Ex. F. In the 2008 Charge, Plaintiff alleged that he had been discriminated against on the basis of his race because, although he was promoted to Associate Professor in 1998, he had been denied tenure. He explained it was his "understanding by university policy that I obtained tenure when my status changed to Associate Professor," adding that he had been informed he did not have tenure. 2008 Charge, Defendant's Ex. F. He also alleged it was his "understanding that African American professors had been granted tenure since I have been seeking tenure." *Id.*

In support of his contention that his failure to receive tenure and a promotion were discriminatory, Plaintiff alleges that tenure and a promotion were granted to less qualified African American faculty members who were hired after Plaintiff. In his deposition, he identified two professors, Dr. George Acquaah and Dr. Corey Miller. Plaintiff's dep., Defendant's Ex. E, pp. 104-107. The record indicates Dr. Acquaah joined the Langston faculty in 1991; from 1997 through 2008, he was Chairman of Langston's Department of Agriculture and Natural Resources; however, in 2008 he was named Dean of the College of Arts and Sciences at Bowie State University in Maryland. A copy of his *curriculum vitae* is submitted as Exhibit 10 to the Montgomery affidavit, Defendant's Ex. A. Plaintiff testified that Dr. Acquaah was less qualified than Plaintiff for tenure and a position as full professor because he believed Dr. Acquaah had fewer publications than

Plaintiff, and Plaintiff believes that should be the primary criterion for judging his qualifications. Plaintiff's dep., Defendant's Ex. E, p. 104, lines 18-25. According to his *curriculum vitae*, Dr. Acquaah has published seven textbooks, and had another scheduled for publication in 2006; he lists numerous articles and abstracts among his publications. Defendant's Ex. A-10. In addition, he received numerous awards and honors, including teaching awards at Langston; Dr. Acquaah was also a Fulbright Scholar. *Id.*

Plaintiff also believes he was more qualified than Dr. Corey Moore because Dr. Moore has fewer publications and did not join the faculty until several years after Plaintiff was hired. Plaintiff testified he thought Dr. Moore's academic discipline was "criminology or maybe public health or something like that." *Id.*, p. 107. Dr. Moore's *curriculum vitae*, submitted as Exhibit 9 to the Montgomery affidavit, reflects that he is currently Chairman of the Department of Rehabilitation Counseling and Disability Studies at Langston and director of Langston's graduate program in Rehabilitation Counseling; he has been on the Langston faculty since 2000. His list of authored and co-authored publications comprises approximately four pages of his *curriculum vitae*; approximately three additional pages list papers presented at professional meetings. Defendant's Ex. A-9.[3]

The record does not reflect the dates on which either Dr. Acquaah or Dr. Moore were granted tenure. The record indicates Dr. Acquaah, who joined the Langston faculty in 1991, did not become a full professor until 2002, as he lists his title as Assistant Professor until that year. Defendant's Ex. A-10, p. 4. Dr. Moore appears to have joined the faculty in 2000, and the record indicates he became a full professor in 2005. Defendant's Ex. A-9, p. 1-2.

---

[3]The record does not include Plaintiff's *curriculum vitae*, nor does he submit a list his publications.

The parties agree that, in December 2008, Plaintiff submitted a leave request for the time period of January 5 through January 15, 2009. The leave was approved by Plaintiff's immediate supervisor, but was denied by Dr. Montgomery. Plaintiff does not dispute that Dr. Montgomery's reason for denying leave during this time period was the fact that the Faculty Institute, at which attendance by all faculty was mandatory, took place during a portion of the requested leave period. Montgomery affidavit, Defendant's Ex. A, ¶ 15.

It is also not disputed that, on or about July 27, 2009, Plaintiff submitted a leave request for the time period of July 29, 2009 through August 14, 2009. The parties agree that his request for leave for the period of July 29 through August 7, 2009 was approved; however, leave for the balance of the time period was denied. As explained in a memorandum from Clarence A. Hedge, Acting Dean of the School of Arts and Sciences, leave for the period of August 10 through 14, 2009 was denied because August 10, 2009 was the first day of the 2009 Faculty Institute. July 28, 2009 Memorandum, Defendant's Ex. A-8. According to Dr. Hedge, Plaintiff's absence from the Faculty Institute would require approval from the Vice President of Academic Affairs. However, Dr. Hedge approved the requested leave except for that portion comprising the days on which the Faculty Institute was scheduled. *Id.* at ¶ 4.

Plaintiff does not dispute that all faculty members were required to attend the Faculty Institute, which was held at the beginning of each academic semester. In his deposition, he admitted that he knew the Faculty Institute was scheduled during the two leave periods he requested. Plaintiff's dep., Defendant's Ex. E, p. 129, lines 23-25; p. 130, line 1. He did not think the Faculty Institute was helpful, and described it as "kind of boring." *Id.*, p. 129, lines 4-11.

On or about March 17, 2009, Plaintiff filed a second Charge of Discrimination (the "2009 Charge"), alleging he had been subjected to race discrimination and retaliation by Defendant after he filed the 2008 Charge. 2009 Charge, Defendant's Ex. G. Plaintiff alleged:

> I am being treated to different terms and conditions of employment, in that: I have been denied a raise given to non-white employees. I have completed a promotion application for full-tenure, which should have been announced by September 5, 2008. I was told by another professor in November 2008 that they are holding off on tenure announcements because someone is suing the University. On or about December 5, 2008, I submitted a vacation request for January 5, 2009 to January 15, 2009 which was approved by my supervisor, but denied by Dr. Clyde Montgomery.

*Id.*

It is not disputed that Plaintiff remains employed as a tenured Associate Professor of Physics at Langston. According to his testimony, no one has indicated to him that his employment is in jeopardy.

IV. Standard of proof - Title VII claims:

Plaintiff's Title VII claims of discrimination and retaliation are governed by the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). *Young v. Dillon Companies*, 468 F. 3d 1243, 1249 (10th Cir. 2006). According to this analysis, Plaintiff must initially establish a *prima facie* case of discrimination/retaliation based on his status; if he does so, the burden shifts to Defendant to present a justifiable, non-discriminatory reason for its conduct. *Id.* If Defendant presents such a reason, then the burden of proof shifts back to Plaintiff, who must show that the proffered justification is a mere pretext for unlawful employment discrimination. *McDonnell Douglas*, 411 U.S. at 804.

A.  Plaintiff's discrimination claim

To establish a *prima facie* case of race discrimination in employment based on discriminatory treatment, a plaintiff typically must show three essential elements:  1) Plaintiff belongs to a protected class; 2) he suffered an adverse employment action; and 3) similarly situated employees who are not members of the minority class were treated more favorably. *Orr v. City of Albuquerque*, 417 F. 3d 1144, 1149 (10th Cir.2005);  *Baker v. Blue-Cross Blue Shield of Kan., Inc*. 128 F. App'x 701, 703 (10th Cir.2005) (unpublished opinion) (citing *Trujillo v. University of Colorado Health Sci. Ctr.*, 157 F. 3d 1211, 1215 (10th Cir.1998)).   The third element may also be satisfied by evidence that the challenged action took place "' under circumstances giving rise to an inference of discrimination.'"[4] *Barone v. United Airlines, Inc.*, 2009 WL 4547800, at *9 (10th Cir. Dec. 7, 2009) (unpublished decision) (quoting *E. E. O. C. v. PVNF, Inc.*, 487 F. 3d 790, 800 (10th Cir. 2007).

Where, as here, the Plaintiff is not a member of a protected class, his claim must be analyzed as a reverse discrimination claim, and his *prima facie* burden under *McDonnell Douglas* is altered.  *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992).   The Tenth Circuit has repeatedly held that a *prima facie* case of reverse discrimination requires a heightened showing:

> [A] plaintiff alleging reverse discrimination "must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."  Alternatively, a plaintiff may produce facts "sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred."

---

[4]The Circuit has acknowledged that the *McDonnell Douglas* framework "is flexible and that a comparison to similarly situated co-workers need not be made in every case." *Baker*, 128 F. App'x at 703 (citing  *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 & nn. 6 & 7 (10th Cir.2000)).

*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F. 3d 1193, 1201 (10th Cir. 2006) (quoting *Notari*, 971 F.2d at 589-90); *see also Adamson v. Multi Community Diversified Services, Inc.*, 514 F. 3d 1136, 1141 (10th Cir. 2008); *Mattioda v. White*, 323 F. 3d 1288, 1293 (10th Cir.2003). If Plaintiff cannot show such background circumstances, he may establish a *prima facie* case by direct evidence of discrimination or indirect evidence "whose cumulative force" would suffice to support "as a reasonable probability" the inference that, but for Plaintiff's race, he would not have incurred adverse treatment. *Notari*, 971 F.2d at 589. To satisfy this alternative burden, it is not enough for Plaintiff to merely allege that, but for his different characteristics, he would have been treated differently:

> Instead, the plaintiff must allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred.

*Id.* at 590.

It is not disputed that Langston has traditionally been regarded as a university consisting primarily of African American students and faculty. In fact, it was originally established as an institution of higher learning for African American students. The undisputed evidence shows that the majority of its students and its faculty are African American. Thus, the Court concludes that it could arguably be in the category of an employer who could discriminate against the majority. For purposes of this Motion, the Court will assume that Plaintiff can satisfy this initial prong of his *prima facie* burden.

Plaintiff must, of course, also establish the second element of an adverse employment action. An adverse employment action occurs "under circumstances that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Stinnett v. Safeway, Inc.*, 337 F. 3d 1213, 1217 (10th Cir. 2003). A "mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action for purposes of a disparate treatment claim.[5] *Piercy v. Maketa*, 480 F. 3d 1192, 1203 (10th Cir. 2007). To determine whether an adverse employment action occurred, the Court must employ a "case-by-case approach, examining the unique factors relevant to the situation at hand." *Id.*

In this case, Plaintiff initially alleged that he was denied tenure and that the denial was racially motivated. However, it is undisputed that he was granted tenure on June 19, 2009. Plaintiff argues, however, that the delay in granting tenure was racially motivated and adverse to him. Although Plaintiff does not explain the consequences of the delay, the Court will assume, at this stage of the proceedings, that the delay was adverse to Plaintiff.

The evidence reflects, however, that Plaintiff was not the only professor whose grant of tenure under the 1981 Handbook was delayed; the facts establish that he was one of 16 professors in this category and that the majority of those affected were either African American or members of another protected category. There is no evidence that suggests even an inference that the delay in awarding tenure to Plaintiff was related to his race.[6] Plaintiff contends, however, that the Court should view his situation differently because he was the only one of the affected faculty members

---

[5]Where a plaintiff claims an adverse action was based on retaliation for the exercise of Title VII rights, the concept of an adverse employment action differs. *Piercy,* 480 F. 3d at 1203 n. 12. That analysis is applied in this case to Plaintiff's retaliation claim, discussed *infra.*

[6]Plaintiff suggests that a racial motive is evidence by the fact that, on two occasions during his employment at Langston, African American faculty members made racial comments. That two comments were made during a fourteen year period of employment is not sufficient to create a factual dispute regarding his claim of reverse race discrimination. His belief that there was hostility on the part of some other faculty members is insufficient as a matter of law, as he must present evidence beyond his own conclusory beliefs. *See, e.g., Adler,* 144 F.3d at 671.

who asked why he had not been granted tenure. He contends that he began inquiring as early as 1999, when he had been a faculty member for six years and that his inquiries were ignored. Defendant asserts, however, that Plaintiff cannot assert a Title VII reverse discrimination claim based on Defendant's actions or omissions which occurred more than 300 days prior to the filing of his initial Charge of Discrimination, which was filed on June 5, 2008. Defendant's Exhibit F. In that charge, Plaintiff complained that he was told by Dr. Haysbert on April 24, 2008 that he had not been granted tenure, although he believed he was eligible after his promotion to Associate Professor in 1998. *Id.*

Assuming, at this stage of the litigation, that Plaintiff's allegations are timely, there is no evidence that the delay in considering Plaintiff for tenure was racially motivated. In fact, the only evidence in the record is to the contrary because Plaintiff was only one of 16 faculty members who should have been granted tenure at an earlier date, and there is no evidence that Langston's failure to honor its own tenure policy was racially motivated. Its failure impacted faculty members of all races, and there is no evidence that Plaintiff or other Caucasian professors were targeted for differential treatment. That others who were adversely impacted by the delay in granting tenure did not complain does not constitute evidence or an inference that Plaintiff was somehow the focus of the delay. Plaintiff offers no evidence that any adverse consequences resulting from the delay affected him differently than the other 15 professors, nor does he point to any evidence that suggests non-African American professors were singled out for different treatment with regard to Langston's failure to apply its own tenure policies set forth in the 1981 Handbook. In fact, the evidence establishes that three of the affected professors who were hired in the same year as Plaintiff had been hired as Associate Professors in 1993, a position which Plaintiff did not achieve until 1998.

15

Notwithstanding their increased rank at the time of their hiring, they were nevertheless also overlooked for tenure until 2009. The Court concludes that the undisputed evidence reflects that Plaintiff cannot satisfy his *prima facie* burden of showing that the delay in achieving tenure was motivated by reverse racial discrimination.

Even if the Court were to determine that Plaintiff could establish a *prima facie* case, however, the Court must then determine if Defendant has presented a justifiable, nondiscriminatory reason for the failure to grant him tenure at an earlier date. A defendant's burden of establishing a legitimate, nondiscriminatory reason for its employment action is "exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F. 3d 1160, 1173 (10th Cir. 2007). Once a defendant proffers such reason, the plaintiff must show "there is a genuine issue of material fact regarding whether the ...justification was pretextual." *Id.* (citing *Young v. Dillon Companies, Inc.*, 468 F. 3d 1243, 1249 (10th Cir. 2006).

In this case, Defendant's proffered reason for delaying the grant of tenure to Plaintiff is the fact that it failed to adhere to its own 1981 Faculty Handbook tenure policies, a failure that impacted 16 professors in several racial categories. Therefore, Defendant has satisfied its burden of presenting a nondiscriminatory reason for its actions.

To show that the proffered reason is a mere pretext for discrimination, a plaintiff must show that the reason is "'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief.'" *Montes,* 497 F. 3d at 1173 (quoting *Young,* 468 F. 3d at1249). "Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment. Mere conjecture that the employer's explanation is pretext is an insufficient basis to defeat summary judgment." *Jencks v. Modern Woodmen of America*, 479 F. 3d 1261, 1267 (10th Cir.2007) (citations omitted).

16

"Federal courts are not particularly well-suited to the task of evaluating the criteria for successful tenured professors and are particularly ill-suited to determine the best candidates." *Babbar v. Ebadi,* 2000 WL 702428, at *6 (10th Cir. May 26, 2000) (unpublished opinion) (citing *Bullington v. United Airlines,* 186 F. 3d 1301, 1318 n. 14 (10th Cir. 1999)). Where, as here, the Plaintiff contends he was more qualified than others who were granted tenure at an earlier time, his own conclusory opinions about his qualifications do not give rise to a material factual dispute. *Id.*

Plaintiff must, instead, offer some evidence to show that Defendant's reasons for not granting tenure at an earlier time were motivated by Plaintiff's race; at the summary judgment stage, he must present sufficient evidence to create a material factual dispute on this issue. *Bullington*, 186 F. 3d at 1318. The relevant inquiry in a Title VII discrimination action is not whether Defendant's proffered reasons for denying tenure "were wise, fair, or correct," but whether it "honestly believed those reasons and acted in good faith on that belief." *Id.* (citing *Sanchez v. Phillip Morris, Inc.*, 992 F.2d 244, 247 (10th Cir. 1993)). As the Tenth Circuit has consistently held, "when analyzing the pretext issue, [we] do not sit as 'super-personnel departments' free to second-guess the business judgment of an employer." *Bullington*, 186 F. 3d at 1318 n. 14 (quoting *Simms v . Oklahoma*, 165 F. 3d 1321, 1330 (10th Cir. 1999), *cert. denied,* 528 U.S. 815 (1999)).

The record before the Court reflects that, at the June 2009 Board of Regents meeting, Defendant acknowledged the fact that it had not followed its own procedures regarding tenure as set forth in the 1981 Faculty Handbook. "The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Randle v. City of Aurora*, 69 F. 3d 441, 454 (10th Cir. 1995). Deviations

from established procedures "go only to process and not to purpose or motivation." *Ingels v. Thiokol Corp.*, 42 F. 3d 616, 623 (10th Cir. 1994). In this case, Defendant's failure to follow its own policies and its failure to grant Plaintiff and others tenure at an earlier date "may have been unwise and even flawed;" however, that conclusion does not mean the decision was motivated by discrimination. *Babbar*, 2000 WL 702428, at * 6.

At the summary judgment stage, Plaintiff need not prove beyond a reasonable doubt that Defendant's proffered reason for the delay in granting tenure was a mere pretext for reverse race discrimination. However, Plaintiff must submit sufficient evidence to create a material factual dispute on this issue; Plaintiff must submit more than a "mere scintilla" of evidence, and there must be enough evidence from which a reasonable jury could arguably find in his favor on the issue of pretext.

The evidence before the Court establishes that Plaintiff and 15 other faculty members were delayed in receiving tenure. The evidence further establishes that the delay was caused by Defendant's failure to adhere to its own 1981 policy regarding the manner in which tenure was determined until that policy was revised. Plaintiff offers no evidence, however, that the failure to adhere to the 1981 tenure policy was motivated by reverse racial discrimination. There is no evidence from which it could be inferred that the 1981 policy was not applied to Plaintiff because of his race; in fact, the failure to apply the policy obviously affected faculty members of several races. Accordingly, the Court concludes that Plaintiff has offered insufficient evidence to avoid summary judgment on the claim that Defendant's delay in granting him tenure was motivated by reverse race discrimination. Defendant is entitled to judgment on this claim.

B. Plaintiff's retaliation claims:

Plaintiff also contends, however, that Defendant retaliated against him after he filed charges of discrimination. Specifically, Plaintiff contends that he was denied a salary increase, that he was denied leave, and that he was denied promotion to a full professorship.

To satisfy his *prima facie* burden on his claim of retaliation for having exercised rights pursuant to Title VII, Plaintiff must show that 1) he engaged in protected opposition to discrimination; 2) his employer subsequently took action that a reasonable employee would have found materially adverse; and 3) there is a causal connection between Plaintiff's protected activity and the adverse action. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Campbell v. Gambro Healthcare, Inc.*, 478 F. 3d 1282, 1287 (10th Cir. 2007); *Argo v. Blue Cross and Blue Shield of Kansas*, 452 F. 3d 1193, 1202 (10th Cir. 2006).

Because Plaintiff filed formal Title VII charges of discrimination, he has satisfied the initial prong of his *prima facie* burden. To establish the second required element, he must show that he suffered an adverse employment action.

An adverse action does not include circumstances involving "'a mere inconvenience or an alteration of job responsibilities.'" *Wells v. Colorado Dept. of Transportation*, 325 F. 3d 1205, 1213 (10th Cir. 2003) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F. 3d 847, 857 (10th Cir. 2000)). Examples of materially adverse actions recognized by the Tenth Circuit as sufficient for this element include "firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (citing *Acquilino v. Univ. of Kansas*, 268 F. 3d 930, 934 (10th Cir. 2001).

However, materially adverse actions are not limited to "ultimate employment decisions." *Burlington Northern*, 548 U.S. at 67. "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm;" the law is designed to cover conduct which could dissuade "a reasonable worker from making or supporting a charge of discrimination." *Id.* at 67-68. Thus, a plaintiff may establish a materially adverse action by presenting evidence that he has suffered "injury or harm" as a result of his exercise of Title VII rights. *Burlington Northern*, 548 U.S. at 67. But, the requisite adversity must be material: "We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" *Id.* at 68 (quoting *Oncale*, 523 U.S. at 80) (emphasis in original). Thus, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

In this case, Plaintiff offers no evidence from which a reasonable jury could conclude that he suffered an adverse consequence resulting from the denial of leave. Even if Plaintiff had presented such evidence, however, the record clearly shows that Defendant's denial of the specific requested leave was based on the mandatory attendance policy for the Faculty Institute, which was scheduled during both requested leave periods. Thus, the evidence shows that Defendant had a legitimate, non-retaliatory reason for denying the requested leave.

The denial of a salary increase and the denial of a requested promotion to full professor would, of course, qualify as adverse employment consequences. However, Plaintiff must also present evidence to show a causal connection between the exercise of Title VII rights and these

consequences. In this case, Plaintiff's initial Charge of Discrimination was filed in June of 2008; the second was filed in March of 2009. Presumably, Plaintiff contends he was denied a salary increase because of the initial charge, as it is expressly referenced as an alleged retaliatory action in the March 2009 Charge of Discrimination. Defendant's Ex. G.

There must be a close temporal proximity between the protected action and the adverse employment event to support an inference of retaliatory motive. *Candelaria v. EG & G Energy Measurements*, *Inc.*, 33 F. 3d 1259, 1261-62 (10th Cir. 1994); *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071(1982). This circuit has held that a period of more than three months, without more, is insufficient to establish causation. *Richmond v. Oneok, Inc.,* 120 F. 3d 205, 209 (10th Cir. 1997). The lack of temporal proximity does not, however, necessarily defeat causation. *Anderson v. Coors Brewing Company*, 181 F. 3d 1171, 1179 (10th Cir. 1999). Instead, it requires Plaintiff to provide additional evidence to support causation. *Id.*

The evidence in the record establishes that Langston's merit salary plan was approved by the Board of Regents in 2007 and became effective in October of 2007. Masters affidavit, Defendant's Ex. G. This plan, which delayed a merit increase for Plaintiff and other faculty members, was adopted and implemented prior to Plaintiff's filing of a Charge of Discrimination. To the extent Plaintiff argues that he was denied an increase after he filed the June 2008 Charge of Discrimination, the evidence does not support a causal connection between that filing and his failure to receive a merit increase; the only evidence regarding salary increases is based on the five-year plan which had already been adopted when he filed the first charge. It is not disputed that Plaintiff was among the

faculty members scheduled for an increase for fiscal year 2010 and that he and others in the same category received the scheduled increases.

Plaintiff has offered no evidence from which a reasonable jury could conclude that Defendant retaliated against him by denying him a salary increase. The evidence in the record establishes that the merit increases were based on the length of service of faculty members and, according to the plan adopted and approved by the Board of Regents, Plaintiff received a salary increase at the time he was entitled to an increase. There is no evidence that Plaintiff was treated any differently from others having the same years of service at Langston. Plaintiff has failed to show any causal connection between his exercise of Title VII protected rights and Defendant's failure to award him a merit increase at an earlier date.

With respect to the denial of his application for a promotion to full professor, the evidence reflects that decision occurred in June of 2009, after both charges of discrimination had been filed. The most recent charge, on March 17, 2009, was filed approximately three months prior to the decision to deny his requested promotion. As noted above, this Circuit has held that a period of three months is not sufficient to infer a retaliatory motive. *Richmond,* 120 F. 3d at 209. Even if the time period here were sufficient to show close temporal proximity and thus establish Plaintiff's *prima facie* element of causation, temporal proximity is not sufficient, without more, to show the pretext required to overcome an employer's justifiable business reason for an adverse action. *Pinkerton v. Colo. Dept. of Transportation,* 563 F. 3d 1052, 1066 (10th Cir. 2009).

In this case, Defendant has submitted undisputed evidence showing that no Langston faculty member was promoted to full professor in 2009, the time period in which Plaintiff's application was considered. The June 19, 2009 Board of Regents meeting reflects several

individuals were promoted to the position of Associate Professor, but no one was promoted to full professor. Defendant's Ex. A-3, pp. 49-50. Plaintiff has submitted no evidence that the denial of his application was motivated by retaliation for the exercise of Title VII rights.

Plaintiff's contention that Dr. Acquaah and Dr. Moore were named full professors despite having qualifications inferior to those of Plaintiff is not supported by any evidence in the record. Although Plaintiff believes he authored more publications than these professors or was otherwise better qualified, he presents no evidence other than his personal belief. His personal beliefs and conclusory statements are insufficient to create a material fact dispute regarding his claims of discrimination and retaliation.[7] *Adler*, 144 F. 3d at 671-72.

## V. Conclusion:

Having fully reviewed the record in light of the applicable law, the Court concludes that, for the reasons discussed herein, Defendant is entitled to judgment on all claims asserted by Plaintiff. Accordingly, Defendant's Motion for Summary Judgment [Doc. No. 34] is GRANTED. Judgment shall enter in favor of Defendant on all claims asserted by Plaintiff.

IT IS SO ORDERED this 6th day of May, 2010.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE

---

[7]Although Plaintiff characterized his failure to receive a merit increase and to be promoted to a full professorship as retaliation claims, his response indicates he views this conduct as reverse racial discrimination. Because the same analysis applies to both Title VII discrimination and retaliation claims, the Court's conclusion would be the same under either category of Title VII.